**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KENT POWE | : | |
| | : | |
| Appellant | : | No. 429 EDA 2023 |

Appeal from the Judgment of Sentence Entered December 14, 2022
In the Court of Common Pleas of Montgomery County
Criminal Division at No:  CP-46-CR-0000207-2021

BEFORE:  STABILE, J., KUNSELMAN, J., and McLAUGHLIN, J.

MEMORANDUM BY STABILE, J.:         **FILED OCTOBER 24, 2023**

Appellant, Kent Powe, appeals from the judgment of sentence imposed on December 14, 2022 in the Court of Common Pleas of Montgomery County following his convictions of one count each of criminal attempt, kidnapping; robbery, fear of serious bodily injury; persons not to possess a firearm; possessing instrument of crime with intent to employ criminally; and false imprisonment.[1]  Appellant raises two claims of trial court error relating to his motion to suppress, contends the evidence was insufficient to sustain his conviction for robbery, and argues the court abused its discretion by imposing maximum sentences running consecutively.[2]  Following review, we affirm.

---

[1] 18 Pa.C.S.A. §§ 901(a), 3701(a)(1)(ii) (second crime of violence), 6105(a)(1), 907(a), and 2903(a), respectively.

[2] We note that the Commonwealth did not file a brief in this appeal.

The charges against Appellant stemmed from an incident that occurred

on November 4, 2020, in Lower Merion, Montgomery County. As the trial court

explained, and as our review of the record confirms:

> At approximately 6:50 p.m., the victim, G.P. (hereinafter referred to as "G.P."), arrived at her residence in the Royal Athena apartment complex, parked her car in her assigned parking space in the garage and gathered her items from her car to enter the apartment building. While doing so, she observed a middle-aged black male loitering in the parking garage area outside the apartment building near the elevator lobby entrance doors. She described him as tall, thin, middle-aged, short grey hairs around his temple area, and wearing a black baseball cap, black face mask, dark-colored hooded sweatshirt and black pants. This man was later identified as [Appellant].
>
> As G.P. approached the elevator lobby doors, she could hear [Appellant] talking on his cellular phone. He said, "I'm here, what floor do I go to?" When G.P. proceeded inside the secured apartment complex and into the elevator lobby using her key fob, [Appellant] followed right behind her. G.P. was holding her mobile phone, her backpack, her work laptop and her purse with her wallet inside. The elevator arrived and G.P. entered the elevator. [Appellant] followed her inside the elevator and stood behind her. G.P. pressed "3" for her floor, and asked [Appellant] for his floor, to which he replied, "5." When the elevator doors closed, [Appellant] held a handgun to the left side of the midsection of G.P.'s back and said "you know what this is." G.P. replied, "Is this a joke?" then turned around and observed [Appellant] holding a dark gray handgun.
>
> Thankfully, another tenant had called the elevator at the second floor lobby level and it stopped there for a woman and child to get on. This stop provided G.P. an opportunity to escape from [Appellant]. [Appellant] directed her to exit the elevator with him, pushing her out of the elevator while holding the firearm close to his right side to shield it from others in the area. G.P. exited the elevator with him, but then quickly turned around and re-entered the elevator as the doors closed, leaving [Appellant] in the lobby area. [Appellant] then exited the building through the lobby doors and fled in his vehicle, which was parked in a parking spot in the garage. G.P. went inside her apartment and called police.

Trial Court Opinion, 3/28/23, at 3-4 (citations to notes of testimony omitted).

While investigating the incident involving G.P., detectives learned of two similar instances in Cherry Hill, New Jersey. The victims in those instances were, like G.P., Caucasian women who resided in affluent areas. Those two victims offered descriptions of their assailant that were similar to G.P.'s description of Appellant. Importantly, their assailant engaged in a similar ruse, pretending to be contacting or attempting to contact another resident of the area. In each instance, the assailant drove a vehicle that matched the description of the vehicle driven by G.P.'s assailant. In the first of the Cherry Hill incidents, which occurred at approximately 7:10 p.m. on November 14, 2020, the victim was S.L. Her assailant pretended to be trying to contact one of S.L.'s neighbors. As S.L. was assisting him in locating the person, the assailant struck S.L., causing her to fall to the ground close to where the assailant's car was parked with its trunk open. When S.L. screamed for help, her assailant closed the car's trunk and fled in the car.

The second incident occurred six days later, on November 20, 2020, at approximately 7:40 p.m., when the victim, M.A., arrived at her condominium complex after work. She pulled into the garage and locked her car. The garage door, which had been broken for a few days, remained open.

M.A. observed a man, later identified as Appellant, coming through the open garage door and heading toward her. Appellant stopped M.A. before she reached the secured door leading to the lobby. He told her he was working as

a painter on the fourth floor and asked her help getting into the building. She

agreed. After retrieving her mail, she got into the elevator, pressed "4" for

him and "3" for her. Appellant then said he had to go the second floor, so M.A.

pushed "2." As the trial court explained:

> When the elevator arrived at the second floor, [Appellant] did not exit. The elevator doors closed, and [Appellant] pulled out a gun and pointed it to M.A.'s face directing her to turn in to the corner. She complied. While holding her at gunpoint, [Appellant] took her purse and two other bags that she was holding. He then commanded, "don't say anything, keep silent, or I'll kill you." The elevator arrived back down to the lobby floor and [Appellant] directed M.A., while holding her at gunpoint, to move forward off the elevator. [Appellant] walked behind M.A. with the gun pointed into her back, and directed her toward the exit from the garage (the garage door was open) and to his vehicle, a black sedan that was parked along the sidewalk outside the condominium building. The trunk of the vehicle was open. [Appellant] directed M.A. to climb into the trunk and he started pushing her into the trunk. M.A. resisted and attempted to flee; however, [Appellant] struck her in the forehead with his forearm and caused her to fall to the ground. M.A. got up, and [Appellant] continued to push her into the trunk by grabbing her with his hands. She continued to resist and he again hit her in the head and caused her to fall a second time. [Appellant] then fled the scene in his vehicle with the bags he took from M.A. in the elevator.
>
> Law enforcement in Montgomery County, Pennsylvania and Cherry Hill, New Jersey worked together to identify [Appellant] and his vehicle using surveillance footage.[3]

---

[3] Surveillance footage captured Appellant's black Nissan Altima sedan at all three locations at issue. The vehicle had some distinguishing features, such as heavily tinted windows, after-market wheels, an after-market spoiler, and a chrome strip above the license plate. Those features, in conjunction with Pennsylvania registration stickers, helped detectives identify the vehicle and its owner despite the fact the license plate was covered up.

*Id.* at 7-8 (citations to notes of testimony omitted). Ultimately, using surveillance footage and vehicle registration records, detectives were able to learn Appellant's identify and obtain a Philadelphia residential address. Detectives also learned of a Delaware County address that Appellant frequented.

During the investigation, detectives obtained and executed a search warrant for each of the two residences. Upon executing the warrant for Appellant's Philadelphia address, detectives located clothing consistent with clothing captured on footage from November 4, 2020, at the Royal Athena apartments where G.P. resided. They also located various documents in Appellant's name, along with a roll of packing tape, consistent with tape Appellant was holding while putting on a pair of gloves at G.P.'s apartment complex. During the search, detectives located a black safe on the floor of the closet in the bedroom they believed was Appellant's bedroom. Because they were unable to open the safe, the detectives took it to the Lower Merion police department where they had tools used to open the safe forcefully. In the safe, they located various documents, including Appellant's birth certificate and social security card, as well as the title to the Nissan Altima. In addition, they found "a gun box containing a black handgun, a gun clip and ammunition[,] and a pair of grey gloves (that matched what [Appellant] is seen wearing in the surveillance footage)." *Id.* at 12 (citations to notes of testimony omitted).

Upon executing the warrant for the Delaware County residence, officers encountered Appellant, took him into custody, and transported him to Lower Merion Police headquarters. There, Appellant was Mirandized and gave a statement in which he admitted being at the Royal Athena apartments on November 4, 2020, and identified the Nissan Altima as his vehicle. Appellant also consented to a search of his cell phone. Subsequent cell analysis confirmed the presence of Appellant's cell phone at the three locations at issue and at the times of the incidents. Finally, DNA analysis of the gun located in the Philadelphia residence safe led to the DNA expert's conclusion that Appellant "was a positive contributor to the DNA profile found on the exterior of the handgun." *Id.* at 14 (citation to notes of testimony omitted).

Trial was conducted in August 2022 with Appellant proceeding *pro se*, with backup counsel. At the conclusion of trial,[4] the jury found Appellant guilty of the crimes enumerated above. A post-sentence investigation report ("PSI") was ordered and, on December 14, 2022, the trial court sentenced Appellant to an aggregate term of 31 to 62 years, reflecting consecutive maximum

_____

[4] In addition to testimony from G.P., the jury heard testimony from S.L. and M.A. in accordance with Pa.R.E. 404(b)(2) (evidence of other crimes, wrongs, or acts may be admissible for "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident . . . if the probative value of the evidence outweighs its potential for unfair prejudice."). Before S.L. and M.A. testified, the trial court delivered an appropriate instruction on the limited purpose for the testimony, **see** Notes of Testimony, Trial, 8/16/22, at 63-64, and repeated that instruction in its charge to the jury. **Id.**, 8/17/22, at 17.

sentences on all counts.[5]   On the same day, the trial court filed a written statement of reasons for deviating from the sentencing guidelines.

Following denial of his post-sentence motions, Appellant filed a timely counseled appeal to this Court.   Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents four issues for our consideration:

1. Did the lower court err in [not] suppressing items recovered from [Appellant's] residence at 2039 S. Redfield St[.], Philadelphia, PA [where] the warrant failed [to] establish a nexus between the crime in question and the residence and failed to set forth any facts establishing probable cause to believe evidence of the crime was inside the residence?

2. Did the lower court err in failing to suppress items recovered from a safe found inside 2039 S. Redfield St. where police failed to obtain a separate warrant for the safe after it had been removed from [Appellant's] residence and taken to Lower Merion Police headquarters?

3. Was the evidence sufficient to sustain [Appellant's] conviction for robbery where the Commonwealth's evidence failed to prove beyond a reasonable doubt that [Appellant's] actions occurred in the course of committing a theft?

4. Was the trial court's departure from the aggravated range of the sentencing guidelines, including imposition of the statutory maximum for attempted kidnapping, robbery, persons not to possess firearms, and false imprisonment with all sentences running consecutively a manifest abuse of discretion, in that it

_____

[5] For attempted kidnapping, robbery, and persons not to possess, the court imposed consecutive sentences of 10 to 20 years in prison for each conviction. The court also imposed a consecutive sentence of one to two years in prison for false imprisonment, for an aggregate sentence of 31 to 62 years. Appellant's possession of instrument of crime conviction merged with his persons not to possess conviction.  Trial Court Opinion, 3/28/23, at 1-2.

imposed the functional equivalent of a life sentence based solely on the circumstances of the crime and [Appellant's] prior record while failing to give adequate weight to [Appellant's] age,[6] his relationship with his daughter, and his potential for rehabilitation?

Appellant's Brief at 3.

In his first two issues, Appellant asserts trial court err for denying his motion to suppress items recovered from his South Redfield Street residence pursuant to a search warrant, including items located in the safe located there but opened at police headquarters. As this Court recently reiterated:

We review a trial court's denial of a suppression motion under the following standard:

[o]ur standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

_____

[6] Appellant, whose date of birth is February 21, 1962, was 58 years old at the time of the crimes and 60 years old at sentencing.

*Commonwealth v. Green*, 298 A.3d 1158, 1162 (Pa. Super. 2023) (quoting *Commonwealth v. Johnson*, 146 A.3d 1271, 1273 (Pa. Super. 2016) (citation omitted)).

Regarding the search warrant for Appellant's South Redfield Street residence, Appellant concedes that the facts set forth in the affidavit "established probable cause that [Appellant] had been the perpetrator of the November 4, 2020 incident." Appellant's Brief at 14. Nevertheless, he asserts that those facts failed to establish any nexus between the crime and Appellant's residence, and failed to suggest that evidence would be found in Appellant's home. *Id.*

Here, the application for search warrant set forth in great detail G.P.'s description of the events of November 4, 2020 at her Royal Athena apartment complex, as well as the investigation into the incident. The warrant also included accounts from S.L. and M.A., along with information regarding the investigation into the similar incidents involving those two women. Based on interviews, surveillance videos, vehicle registration and driver's license information, and a criminal history check that revealed Appellant's extensive criminal history, the trial court concluded

> there was a nexus between the crime in question and the residence at 2039 South Redfield Street in Philadelphia. When analyzed under the totality of the circumstances standard, the facts set forth in the affidavit of probable cause would lead an objectively reasonable and prudent police officer to believe that the evidence used in the commission of the attempted kidnappings, and the ensuing fruits of the crimes, would likely be

found within the residence at 2039 South Redfield Street, Philadelphia, PA 10143.

Trial Court Opinion, 3/28/23, at 21.

The trial court concluded that the warrant "contained substantial evidence to support the issuance of the search warrant." *Id.* We find no error in the trial court's conclusion. Appellant's first issue fails.

Appellant next argues that a separate warrant was required to search the safe once it was removed from his residence. The reason the safe was not opened and searched within the residence was simply a matter of not having the necessary tools to open it.[7]

In support of his assertion that a second warrant was required, Appellant relies on a 1983 case from this Court that we find factually distinguishable and inapposite. In *Commonwealth v. Menginie*, 458 A.2d 966 (Pa. Super. 1983), local Upper Darby police responded to a shooting at 214 North Linden Street. Upon arrival, they found Appellant bleeding on the lawn of a home several doors from 214 North Linden. Appellant told police that he was shot by his brother who was inside the home at 214 North Linden. Upon entering the home, they discovered the brother's body on the floor in one room and also observed a white powdery substance in plain view in one of the bedrooms. They obtained a search warrant for drugs. In the course of searching for

_____

[7] Officers did locate a key at the South Redfield St. residence, but it did not open the safe.

- 10 -

drugs, the police observed a number of motorcycle parts and called in officers from the state police. When it became apparent to state police that there was evidence of criminal trade involving auto parts, the state police obtained another warrant to seek evidence of those illicit activities.

The local police also seized a safe and obtained another search warrant. Menginie argued that the warrant for the safe violated the requirement to include a description of the place to be searched. This Court rejected Menginie's argument. While commenting that it "was reasonable for the police to get a warrant before searching the safe," the Court determined that the warrant was supported by probable cause and satisfied the particularity requirement. *Id.* at 971-72. Menginie did not assert that a separate warrant was required for the safe, only that the warrant was defective. Appellant's reliance on *Menginie* is misplaced.

In the present case, by contrast, the warrant called for a search of the South Redfield Street residence and listed items that were the subjects of the search. Among the items were documents, handwritten notes, firearms, and firearm related items. Clearly, the warrant authorized the police to search the safe found in the bedroom closet, and it was reasonable to believe that the "items to be searched for," listed on Appendix A to the warrant application, would be located in that safe. But for the lack of tools to open the safe within the residence, it would have been opened there and the items located in the safe would have been seized on location. As the trial court concluded, the

- 11 -

search warrant "provided a sufficient basis to search the locked safe, and a second warrant was not required to continue the search of the safe." Trial Court Opinion, 3/28/23, at 23. We find no error in the trial court's legal conclusion. Appellant's second issue lacks merit.

Appellant next challenges the sufficiency of evidence supporting his robbery conviction, contending the evidence did not prove that Appellant's actions occurred in the course of committing a theft. "To sustain a robbery conviction, the Commonwealth must show that the defendant 'in the course of committing a theft, . . . threatens another with or intentionally puts him in fear of immediate serious bodily injury.'" *Commonwealth v. Dunkins*, 229 A.3d 622, 632 (Pa. Super. 2020) (quoting 18 Pa.C.S.A. § 3701(a)(1)(ii)). "[R]obbery does not require the completion of the predicate offense, theft, but it does require that force be utilized or threatened while in the course of committing a theft." *Commonwealth v. Austin*, 906 A.2d 1213, 1221 (Pa. Super. 2006), overruled on other grounds by *Commonwealth v. Miller*, 35 A.3d 1206 (Pa. 2012).[8]

_____

[8] The trial court noted that it delivered the standard jury instruction for robbery, as follows:

> Now I'm going to give you the elements of the crime of robbery. It's robbery, fear of serious bodily injury. To find the defendant guilty of this offense, you must find that the following two elements have been proven beyond a reasonable doubt.

*(Footnote Continued Next Page)*

As this Court has recognized:

Our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. **The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence**. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

---

The first element, that the defendant threatened the victim with serious bodily injury or intentionally put the victim in fear of immediate serious bodily injury. That's the first element. And the second element is that the defendant did this during the course of committing a theft.

You can find the defendant guilty if you find beyond a reasonable doubt that he did these things either while actually committing a theft or attempting to commit a theft. And theft means taking someone else's property.

Trial Court Opinion, 3/28/23, at 24-25 (quoting Notes of Testimony, Trial, 8/17/22, at 27).

*Dunkins*, 229 A.3d at 631 (quoting *Commonwealth v. Leaner*, 202 A.3d 749, 768 (Pa. Super. 2019) (emphasis added; citation omitted)).

Appellant argues that the only evidence supporting an intent to commit a theft at the Royal Athena apartments was his "entry of the building under a ruse, the placing of a gun against G.P.'s back and ordering her to leave the elevator." Appellant's Brief at 28. He suggests that "while this evidence demonstrated an intent to abduct G.P., it was equally consistent with abducting the victim for the purpose of raping, assaulting, or even killing her." *Id.* He rejects the trial court's contention that taking M.A.'s bag and purse in the second Cherry Hill incident is proof he intended to take G.P.'s belongings. *Id.* at 28-29.

However, as the trial court observed, the evidence of the Cherry Hill incidents—admitted in accordance with Pa.R.E. 404(b)(2)—provided evidence from which the jury could conclude that Appellant intended to commit a theft at the Royal Athena apartments.

> This intent is corroborated by the fact that G.P. was holding her personal and valuable belongings while [Appellant] held her at gunpoint. It was reasonable for the jury to conclude that [Appellant's] intent was, in addition to kidnaping his victim, to take her personal belongings. The fact the G.P. was able to escape from [Appellant] by acting quickly to get back into the elevator as the doors closed does not change the course of events [Appellant] already put into motion.
>
> Viewing all the evidence in the light most favorable to the Commonwealth as the verdict winner, the Commonwealth produced sufficient evidence to establish beyond a reasonable doubt that [Appellant] was guilty of robbery.

Trial Court Opinion, 3/28/23, at 27.

Based on our review of the record, viewing the evidence in the light most favorable to the Commonwealth, we agree with the trial court's conclusion that the evidence was sufficient to support Appellant's conviction of robbery. Appellant's sufficiency challenge fails.

In his fourth and final issue, Appellant argues that the trial court abused its discretion by imposing maximum, consecutive sentences for each of Appellant's convictions. As such, Appellant challenges the discretionary aspects of his sentence. As this Court has explained:

> Challenges to the discretionary aspects of sentencing do not entitle a petitioner to review as of right. **Commonwealth v. Allen**, 24 A.3d 1058, 1064 (Pa. Super. 2011). Before this Court can address such a discretionary challenge, an appellant must comply with the following requirements:
>
>> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

**Commonwealth v. Caldwell**, 117 A.3d 763, 768 (Pa. Super. 2015) (*en banc*) (quoting **Allen**, 24 A.2d at 1064).

Here, Appellant filed a timely notice of appeal and preserved the issue in a post-sentence motion. Further, Appellant has included a Rule 2119(f)

statement in his brief. Therefore, we must determine whether he has raised a substantial question.

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." *Caldwell*, 117 A.3d at 768 (quoting *Commonwealth v. Prisk*, 13 A.3d 526, 533 (Pa. Super. 2011)). Further, "[a] substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Id.* (internal citations omitted).

In his Rule 2119(f) statement, Appellant contends that the imposition of maximum, consecutive sentences "was at odds with the fundamental norms of the sentencing process," and that the court's goal was "to impose the functional equivalent of a life sentence . . . based on a myopic focus on the facts of the case and [Appellant's] prior record . . . with no regard to [Appellant's] age, his relationship with his daughter, and his potential for rehabilitation." Appellant's Brief at 16.

Imposition of consecutive sentences does not ordinarily raise a substantial question. *See, e.g., Commonwealth v. Mastromarino*, 2 A.3d 581, 587 (Pa. Super. 2010). However, we conclude that Appellant's challenge to the imposition of consecutive sentences as excessive, coupled with his claim that the trial court failed to consider his rehabilitative needs, presents a

substantial question. **_Accord Caldwell, supra. See also Commonwealth_**

**_v. Hill_**, 210 A.3d 1104, 1116 (Pa. Super. 2019) (finding a substantial question

where appellant averred trial court failed to consider certain sentencing factors

in conjunction with an assertion that the sentence imposed was excessive).

Therefore, we shall address the merits of Appellant's claim.

When considering a discretionary aspects claim, we employ the following

well-settled standard of review:

> [S]entencing is vested in the discretion of the trial court, and will
> not be disturbed absent a manifest abuse of that discretion. An
> abuse of discretion involves a sentence which was manifestly
> unreasonable, or which resulted from partiality, prejudice, bias or
> ill will. It is more than just an error in judgment.

**_Commonwealth v. Brown_**, 249 A.3d 1206, 1211 (Pa. Super. 2021) (quoting

**_Commonwealth v. Malovich_**, 903 A.2d 1247, 1252-53 (Pa. Super. 2006)

(citation omitted)).

We first reiterate that the trial court had the benefit of a PSI. In

**_Commonwealth v. Devers_**, 546 A.2d 12 (Pa. 1988), our Supreme Court

stated:

> Where pre-sentence reports exist, we shall continue to presume
> that the sentencing judge was aware of relevant information
> regarding the defendant's character and weighed those
> considerations along with mitigating statutory factors. A pre-
> sentence report constitutes the record and speaks for itself. In
> order to dispel any lingering doubt as to our intention of engaging
> in an effort of legal purification, we state clearly that sentencers
> are under no compulsion to employ checklists or any extended or
> systematic definitions of their punishment procedure. Having
> been fully informed by the pre-sentence report, the sentencing
> court's discretion should not be disturbed. This is particularly true,

we repeat, in those circumstances where it can be demonstrated that the judge had any degree of awareness of the sentencing considerations, and there we will presume also that the weighing process took place in a meaningful fashion. It would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand.

*Id.* at 18.

The trial court explained:

Prior to imposing sentence, the court considered a significant amount of information about [Appellant]. The court thoroughly reviewed and considered the PSI, which provided pertinent details on Appellant's family, background, character, personal history and criminal history. The court considered the sentencing guidelines for each offense and the maximum penalties allowed for each offense. The court considered [Appellant's] extensive criminal history consisting of eighteen (18) prior convictions (and various violations of probation and/or parole), many of them for violent offenses including numerous robberies, numerous grand larcenies, assault and aggravated assault.[9] The court considered evidence presented at the sentencing hearing, including a victim impact statement from S.L. and the Commonwealth's argument that [Appellant] has done nothing in his life that would qualify for mitigation and many aggravating factors exist. [Appellant] offered no argument or evidence at the sentencing hearing.

Trial Court Opinion, 3/28/23, at 31. The court included an excerpt from the sentencing hearing transcript in which the court stated its conclusion that the only way the court could fulfill its obligation to protect society was to impose the maximum sentence allowed by law. Further, while the court "wish[ed it] could offer some sort of rehabilitation," it appreciated that previous

_____

[9] The court noted that Appellant's most recent prior conviction was a 2008 conviction for the aggravated assault of his then 13-month-old son, for which Appellant received a sentence of eight and a half to 17 years. Trial Court Opinion, 3/28/23, at 33.

- 18 -

rehabilitative efforts were not effective.  ***Id.*** at 32-33 (quoting Notes of Testimony, Sentencing, 12/14/22, at 27-29).

Upon imposition of sentence in this case, Appellant addressed the court, stating:

> I just want to say thank you.  Because the sentence that you gave me, I deserve it.
>
> . . .
>
> So the sentence that you gave me—and I wish you could have gave me more.  . . . Because where you sending me, that's where I need to be at.  And thank you.

***Id.*** at 33 (quoting Notes of Testimony, Sentencing, 12/14/22, at 34-35).

The court stated its reasons for imposing maximum, consecutive sentences and issued written reasons for deviating above the sentencing guidelines.  The court contended it "properly weighed Appellant's age, family history and potential for rehabilitation with the significance and seriousness of the crimes in this case, the protection of the public and the impact of his egregious crimes on the victim."  ***Id.*** at 35-36.

We find no abuse of discretion on the part of the trial court in its imposition of an aggregate sentence of 31 to 62 years in prison.  Appellant's fourth issue fails.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/24/2023